JUDGE SCHEINDLIN

**08 CV 11383**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
LISA A. STEIMAN,                                              :       __ Civ. __
                                                              :       (ECF)
                    Plaintiff,                                :
                                                              :       **COMPLAINT**
        -against-                                             :
                                                              :       Plaintiff Demands
WPP GROUP PLC and OGILVY & MATHER                             :       Trial By Jury
WORLDWIDE, INC.                                               :
                                                              :       DEC 31 2008
                    Defendants.                               :
                                                              :       U.S.D.C. S.D.N.Y.
------------------------------------------------------------ X       CASHIERS



        Plaintiff, Lisa A. Steiman, by her attorneys, Liddle & Robinson, L.L.P., for her Complaint alleges as follows:

## THE NATURE OF THE ACTION

    1.    This is an action brought on behalf of a former Executive Producer at Ogilvy & Mather Worldwide, Inc. ("Ogilvy") against Ogilvy and WPP Group plc ("WPP") for violations of the Sarbanes-Oxley Act (18 U.S.C. §1514A Section 806 et seq.).

## THE PARTIES

    2.    Ms. Steiman was employed by Defendants Ogilvy and WPP as an Executive Producer from April 1996 until April 2, 2008. Ms. Steiman resides at 250 West 93rd Street, New York, New York 10025.

1

3. Defendant WPP is a publicly traded company that transacts business within the state of New York.

4. Defendant WPP has a business address at 125 Park Avenue, New York, New York 10017-5529.

5. Defendant WPP provides marketing and advertising services.

6. Defendant Ogilvy is a domestic business corporation organized and existing under the laws of New York.

7. Defendant Ogilvy is a wholly owned subsidiary of WPP with its principal executive office located at 125 Park Avenue, New York, New York 10017.

8. Defendant Ogilvy and its affiliates are an intertwined corporate entity, which includes WPP Group plc.

9. Ms. Steiman's stock purchase plans were provided by WPP.

10. WPP issued Ms. Steiman stock options.

11. Ms. Steiman was subject to WPP's ethics policy, as well as other WPP policies.

12. Ms. Steiman signed an agreement regarding WPP's Code of Business Conduct, which bore WPP's logo.

13. WPP and Ogilvy share the same address in New York.

14. Ogilvy shares WPP's website.

15. Ogilvy and WPP share key executives.

16. Luis Bassat is Chairman of Ogilvy Iberia and Chairman of WPP Iberia.

17. Miles Young is Chairman of Ogilvy & Mather Asia Pacific. He also serves on WPP Group's worldwide board and is a member of Ogilvy's executive committee. "Beyond his Ogilvy position, Miles has latterly had a dual role, operating where appropriate as de facto WPP Chairman in the region – supporting acquisitions, developing talent and building practical integration initiatives." He also "represents WPP's corporate interests in Asia, in addition to his Ogilvy responsibilities."

18. Robyn Putter is Chairman of WW Creative Council. He is Creative Head of WPP. "Together with Charlotte Beers, former CEO of )&M Worldwide, [Mr. Putter] pioneered Brand Stewardship, a new way of looking after brands in the O&M Worldwide Network. He chaired the O&M Creative Council for 5

3

years and is still a member and was appointed to the Ogilvy & Mather Worldwide Board in 1994.

19. Steve Goldstein is Chief Financial Officer of Ogilvy & Mather Worldwide. Mr. Goldstein "joined Ogilvy & Mather as Chief Financial Officer in October 1994. Prior to that, Steve was Chief Operating Officer of North America ... for WPP Group plc, based in New York. He originally joined WPP in 1989 as regional finance director for Latin America.

20. Tro Pilguian is Chief Operating Officer of WPP. He also enjoyed a long career at Ogilvy & Mather Worldwide.

21. Kenneth Roman, a former executive of Defendants, was at onetime, Chairman at Ogilvy and Vice Chairman of WPP.

## JURISDICTION

22. This Court has jurisdiction over the Sarbanes-Oxley claims pursuant to federal question jurisdiction, 28 U.S.C. § 1331.

23. Plaintiff has exhausted the administrative remedies available to her under Sarbanes-Oxley in that, on or about July 1, 2008, she filed a Complaint with the United States Department of Labor under Sarbanes-Oxley in accordance with 18

U.S.C. 1514A(b)(1)(A), and the Secretary of Labor has not issued a final decision within 180 days of the filing of the Complaint.

## VENUE

24.	Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Southern District of New York.

## FACTS

25.	Ms. Steiman began employment with Defendants in April 1996.

26.	In her position as Senior Partner, Executive Producer, Steiman's primary role was to create advertising broadcast for use on television and occasionally internet mediums that fulfilled the creative vision of Ogilvy's advertising broadcasts.

27.	Throughout her employment at Defendants, Ms. Steiman reported to Lynn Roer, the Director of the Broadcast Department.

28.	Throughout her employment, Ms. Steiman always performed her duties and responsibilities with Defendants in a professional and satisfactory manner.

29. In November 1998, Defendants promoted Ms. Steiman to the title of Partner.

30. In November 2001, based on her strong performance, Defendants promoted Ms. Steiman to the position Senior Partner, Executive Producer.

31. In 2005, Ogilvy awarded Ms. Steiman an approximate $85,000 raise, increasing her annual compensation from approximately $140,000 to $225,000.

32. During her employment at Defendants, Ms. Steiman received numerous awards, accolades, and positive comments about her performance from those with whom she worked.

33. Prior to August 2007 — when Ms. Steiman told Ms. Roer that she was not comfortable with billing Avon $25,000 through Eyepatch Studios and misrepresenting that the charge was for the music composer, when his services only cost $10,000 — Ms. Steiman had received one prior formal performance review, which rated her performance outstanding.

34. In March 2007, Ogilvy asked Ms. Steiman to assume responsibility as Executive Producer of an account for client Avon (the "Avon Account"), due to Avon's dissatisfaction with Ogilvy's prior performance on this account. Two incidents led to Avon's dissatisfaction with Ogilvy's work.

35. First, Avon was not satisfied with a commercial Ogilvy produced. Defendants agreed to reshoot the commercial at its own expense and absorb the significant cost associated with reproduction of the commercial.

36. The second incident involved production of a television commercial by Defendants on behalf of Avon and a second client, Christian LaCroix, during the summer of 2007. Avon and LaCroix had partnered to promote a perfume product (the "Lacroix/Avon product"). Defendants asked Javier Vallhonrat, a photographer who shot the print advertisements for the LaCroix/Avon product, to direct the shoot for the television commercial. Shortly thereafter, Defendants chose a different director who presented a lower bid than Mr. Vallhonrat.

37. Mr. Vallhonrat subsequently threatened to sue Defendants for unlawfully using his intellectual property in the preparation of the television commercial. Defendants agreed to pay Mr. Vallhonrat $25,000 to resolve his claim (the "Vallhonrat Settlement") against Defendants.

38. Defendants asked Avon to absorb this cost. Avon did not agree to absorb this cost.

39. As a result of the second incident, Lynn Roer, Ms. Steiman's supervisor, directed Ms. Steiman to engage in fraudulent billing as part of an attempt to pass the cost of the $25,000 settlement on to Avon.

40. On August 13, 2007, Ms. Roer requested that Ms. Steiman negotiate a reduction in prices for various expenses of the Avon commercial shoot. Ms. Steiman arranged for the music composer of the commercial to accept a $10,000 payment, rather than the $25,000 payment originally negotiated and budgeted for his services. Mr. Subrechicot, located in France, was contacted via telephone who agreed to accept $10,000 ("the Subrechicot expense").

41. Ms. Roer directed Ms. Steiman to charge the Subrechicot expense through an affiliate of Defendants, Eyepatch Studios, but to bill Avon for the full $25,000 amount — even though Mr. Subrichot was only billing Defendants $10,000. This way, Defendants would fraudulently pass on to Avon $15,000 of the $25,000 Vallhonrat Settlement, even though Avon had expressly refused to pay that cost.

42. Concerned that Ms. Roer's instructions would amount to fraudulent billing, Ms. Steiman reminded Ms. Roer of a 2005 billing matter at Defendants that resulted in the conviction of two of Defendants' executives — Shona Seifert and Thomas Early — for over-billing a federal anti-drug agency, the Office of National Drug Control Policy, for advertising work (the "ONDCP billing scandal").[1] In response to these allegations, Defendants agreed to pay $1.8 million in settlement of civil claims and two executives of the firm were incarcerated for over a year. Ms. Roer still encouraged her to do it.

---

[1] Federal district judge Richard Berman sentenced Ms. Seifert to 18 months incarceration, ordered she pay a $125,000 fine and write a code of ethics for the advertising industry. Mr. Early was sentenced to 14 months and ordered to pay a $10,000 fine.

8

43. After the above meeting, Ms. Steiman continued to have doubts about the propriety of Ms. Roer's instructions to bill Avon $25,000 and misrepresent that the full charge was for the music composer, when his services only cost $10,000.

44. On or about August 16, 2007, Ms. Steiman visited Ms. Roer's office and told her she was not comfortable with billing Avon $25,000 through Eyepatch Studios and misrepresenting that the charge was for the music composer, when his services only cost $10,000, especially given Defendants' prior history of fraudulent billing. She told Ms. Roer that she, like Ms. Roer herself, is a mother who could not afford to either lose her job or tarnish her reputation. As Ms. Steiman was about to leave Ms. Roer's office, Ms. Roer said "Well, it's not like we were doing anything wrong; I was just putting a mark-up on it."

45. Thereafter, Ms. Roer and Defendants began to retaliate against Ms. Steiman by marginalizing her, removing her from accounts, not allowing her to work on accounts, even when Defendants' executives specifically requested her, disparaging her within the company, giving her an inaccurate poor performance review, and ultimately terminating her employment.

46. In October 2007, Ms. Roer notified Avon that Ms. Steiman would no longer be working on the Avon Account. Ms. Roer took Ms. Steiman off the Avon account and told her there were no accounts to which she could bill her time. After

she took Ms. Steiman off of the Avon Account, Ms. Roer also began a campaign to prevent her from working on other accounts.

47.  Shortly after Ms. Roer began retaliating against Ms. Steiman, Ms. Steiman sought the intervention of Steve Hayden, Vice Chairman of Ogilvy. Ms. Steiman told Mr. Hayden: (1) Ms. Roer's plan with respect to billing Avon $25,000 through Eyepatch Studios and representing that the charge was for the music composer, when his services only cost $10,000, (2) about how she refused to participate in the plan, and (3) about how Ms. Roer had been retaliating against Ms. Steiman ever since she refused to participate in Ms. Roer's plan. Ms. Steiman requested that Mr. Hayden intervene on her behalf to stop Ms. Roer from blocking Ms. Steiman's placement on accounts.

48.  In or about October 2007, Jeff Curry, Defendants' Creative Director on the Minute Maid account, requested Ms. Steiman be assigned to the Minute Maid account. In January 2008, Ms. Roer pulled Ms. Steiman from the account. Mr. Curry expressed shock and anger to Ms. Steiman that Ms. Roer had pulled Ms. Steiman from the Minute Maid account, without consulting him, the Executive Creative Director, after he had requested her on the account.

49.  On December 11, 2007, Ms. Roer again retaliated against Ms. Steiman by giving her the first poor performance evaluation of her employment with Defendants. The performance evaluation rated Ms. Roer's performance a "3," which Ms.

10

Roer characterized as "needs improvement." Prior to this evaluation, Ms. Roer had received only one other performance evaluation during her career at Defendants, where she received a rating of "1," the highest rating available.

50. Ms. Roer criticized Ms. Steiman in the 2007 evaluation by stating, among other things, "It was unfortunate that [Ms. Steiman] was unable to maintain leadership on the Avon business. This was a brand that truly needed a strong creative lead." Ms. Roer's justification for her criticism of Ms. Steiman however is not credible. First, Ms. Steiman was not the Executive Creative Director on the account and therefore not responsible for this function. Second, one source of the creative problems on the Avon Account was Marc Bown, the Creative Director on the Avon account. Among other things, Mr. Bown was having an affair with Caroline Frangos, an Account executive on the Avon account. The affair significantly undermined and impeded the productivity of the creative team, a fact that was not lost on Avon.

51. On December 16, 2007, Mr. Finley sent Ms. Roer an e-mail requesting that Ms. Steiman be assigned to work on the Tribeca Film Festival campaign. Ms. Roer refused to assign Ms. Steiman to the account.

52. On December 21, 2007, Ms. Steiman e-mailed an internal complaint to Ms. Saline of Ogilvy's Human Resources.

53. During the first week of January 2008, Ms. Steiman met with Carlene Zanne of Human Resources and Joe Panetta, of the Ethics Department, to discuss what had happened with respect to Ms. Roer's plan to bill Avon. At the beginning of the meeting, Ms. Zanne told Ms. Steiman that her complaint had been reported to Ogilvy's Chief Financial Officer and WPP and that both would be involved in the investigation of her complaint. During this meeting, Ms. Steiman explained to Ms. Zanne and Mr. Panetta Ms. Roer's plan to bill Avon $25,000 and represent that the charge was for the music composer, when his services only cost $10,000 and her refusal to participate. Ms. Steiman also told them that Ms. Roer had retaliated against her since she refused to participate in the plan.

54. Ms. Steiman also informed Ms. Zanne and Mr. Panetta that a Senior Level Executive Creative Director[2] had advised her that he did not want to sign the Ethics Agreement because of violations he believed were being committed by "finance." When asked if she was aware of any other unethical practices, Ms. Steiman brought up the issue that Ogilvy is a Screen Actors Guild ("SAG") signatory, which means it is contractually obligated to use SAG talent. However, when Ogilvy performed certain work for Six Flags it did not use SAG talent. In order to hide this fact, she and other Ogilvy Executives were told by Aarthi Thiagarajan, a Senior Level Account Executive, to say that they worked for a company called Redline, not Ogilvy. Ms. Steiman also informed them that Ogilvy often shoots work outside of the country to avoid paying residual payments to SAG actors. Ms. Roer told Ms. Steiman to tell SAG a different reason for why Ogilvy was shooting outside of the country. For example, Ms.

---

[2] The person to whom Ms. Steiman was referring was Chris Wall.

Roer directed Ms. Steiman that if a SAG official were to inquire as to why Ogilvy had shot a certain commercial outside of the country, to tell that official a fabricated reason, for example, that the production costs were lower or that they needed a different seasonal backdrop.

55. Among other things, Ms. Zanne and Mr. Panetta told Ms. Steiman that the Chief Financial Officer of Ogilvy would be in contact with her; that a forensic accountant would audit the records of Eyepatch Studios; and that they would provide Ms. Steiman with weekly updates of their investigation. Finally, they told Ms. Steiman that she "would not be retaliated against during the investigation."

56. Following the above, Ms. Steiman continued to receive positive reviews from individuals with whom she had worked in the past.

57. On January 12, 2008, Ms. Roer informed Ms. Steiman that she was no longer on the Six Flags account. In connection with her removal from the Six Flags account, Mr. Wall told Ms. Steiman that Six Flags had requested she be removed. Ms. Steiman later learned that this was not true.

58. On January 15, 2008, Ms. Steiman sent Ms. Zanne an e-mail informing her that she was being retaliated against for complaining about the above-described ethical violations and unlawful activity. Later that day, Ms. Zanne telephoned Ms. Steiman and informed her that she was to take a paid leave of absence.

59. On April 2, 2008, Ms. Zanne notified Ms. Steiman that it was terminating her employment. According to Ms. Zanne, Defendants' investigation had proved that neither Ms. Roer nor Defendants had done anything wrong.

<u>CLAIM</u>
(Discrimination By Ogilvy and WPP Against
Steiman Under Sarbanes-Oxley)

60. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if separately set forth herein.

61. WPP is a publicly traded company subject to coverage by Sarbanes-Oxley, 18 U.S.C. § 1514A(a).

62. As a wholly owned subsidiary of WPP, Ogilvy is also subject to coverage by Sarbanes Oxley, 18 U.S.C. § 1514A(a).

63. Ogilvy and WPP are a "company" or a "contractor, subcontractor or agent" of a "company" within the meaning of under 18 U.S.C. § 1514A.

64. Steiman was an "employee" of Defendants subject to protection by Sarbanes-Oxley, 18 U.S.C. § 1514A(a).

65. Steiman reasonably believed that Defendants intended to and did commit wire fraud and mail fraud.

14

66. Steiman reported her concerns to persons with supervisory authority over her, and to other such persons working for the employer who had the authority to investigate, discover, or terminate misconduct.

67. Defendants retaliated and discriminated against Ms. Steiman by taking negative employment actions including, *inter alia*, marginalizing her, removing her from accounts, not allowing her to work on accounts, even when Defendants' executives specifically requested her, disparaging her, giving her an inaccurate poor performance review, and ultimately terminating her employment.

68. Defendants knew that Steiman engaged in protected activity because she directly reported the fraudulent activity to three of Defendants' executives: Ms. Roer, Ms. Seifert and Mr. Early.

69. Steiman's protected activity was a contributing factor in Defendants' adverse employment actions, which constituted discrimination against Ms. Steiman in violation of Sarbanes-Oxley, 18 U.S.C. § 1514A.

70. As a result of Defendants' discriminatory conduct, Ms. Steiman has suffered substantial damages, including but not limited to lost wages and benefits in the form of back pay, reinstatement or front pay in lieu of reinstatement, interest, attorneys' fees and costs, and special damages, all in amounts to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Steiman against Defendants Ogilvy and WPP under Sarbanes-Oxley, compensatory damages including back pay, reinstatement or front pay in lieu of reinstatement, special damages, pre-judgment interest, attorneys' fees and costs, in amounts to be determined at trial; and

B. Such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          December 31, 2008

LIDDLE & ROBINSON, L.L.P.

By: _____
Marc A. Susswein, Esq.
800 Third Avenue
New York, New York 10022
(212) 687-8500

*Attorneys for Plaintiff*